1999 OK 59

In the Matter of the ESTATE OF James Denny ESTES, Jr., Deceased,

Opal J. Fox, Appellant/Counter–Appellee,

v.

Robert L. Kramer, Individually, and as Successor Personal Representative of the Estate of James Denny Estes, Jr., Deceased, Appellee/Counter–Appellant.

Nos. 88,500, 88,529.

Supreme Court of Oklahoma.

June 15, 1999.

George W. Underwood, M.M. McDougal, Tulsa, Oklahoma, For Appellant.

James R. Eagleton, Tulsa, Oklahoma, For Appellee.

HODGES, J.

## I. ISSUES

¶ 1 The issues before this Court are (1) whether the district court consolidated the non-probate proceeding and the probate proceeding, and if so, did it err in so doing, (2) whether the district court erred in considering probate and non-probate issues in a single hearing, (3) whether the district court erred in admitting certain depositions, (4) whether the district court, presiding over the non-probate case, erred in granting judgment to the plaintiff, (5) whether the district court abused its discretion, and (6) whether the district court, sitting in probate, had authority to determine title to property held adversely to the estate and to award attorney fees and expert witness fees from estate assets, and did it err in its awards.

## II. FACTS

¶ 2 Opal J. Fox (Fox), the defendant, and the deceased, James Denny Estes, Jr. (Estes), had an intimate relationship for over forty years. Estes was never married. Fox was widowed and had children from her marriage. Robert Kramer, the plaintiff, is Estes' first cousin and, along with Kramer's brother

and other first cousins, Estes' heir-at-law. Robert Kramer and Mrs. Kramer had a close relationship with Estes, including talking with him frequently and having lunch and dinner with him almost every week.

¶ 3    In 1994, Estes was diagnosed with cancer of the bone, liver, spleen, lung bases, and neck. As a result of the cancer, Estes was hospitalized in November of 1994. Because he was unable to care for himself when he was released on November 21, Estes went to stay at Fox's home. Except for two prior days when Estes had been ill, this is the only time that Estes and Fox lived together during their relationship. During the time that Estes was in Fox's home, Robert Kramer or Mrs. Kramer visited Estes frequently. Mrs. Kramer often stayed with Estes to relieve Fox. When Kramer was ill during this time, he did not visit Estes for fear of exposing Estes to germs and adversely impacting his health. Estes died on February 8, 1995.

¶ 4    Fox testified that during the last few weeks before Estes' death that he suffered from periods of delusion and confusion. For example, at one time Estes started to dress to deal with his mother who had died in 1970. After Fox explained to Estes that his mother was dead, he calmed. Another time, Estes insisted that it was urgent that he catch an airplane even though he did not need to go anywhere. After about fifteen minutes after an incident, Estes' confusion would end.

¶ 5    On January 10, 1995, about a month before his death, Estes' attorney, George Underwood, came to Fox's home, and Estes executed a will. In the will, Estes made several specific bequests and named Fox and Kramer as equal residual legatees. Fox received a copy of the will. Also on January 10, Estes signed a power of attorney naming Fox as his attorney in fact.

¶ 6    At the time he signed the will, Estes had his assets in his name only; none were held in joint tenancy. Only two weeks after the will was executed, a flurry of activity began which resulted in Estes' assets being diverted from his estate and changing the deposition of his property.

¶ 7    Changes in Estes' holdings began on January 23, 1995, when Estes' sole ownership of two Bank IV accounts, denoted here as Bank IV Account 3129 and Bank IV Account 1967, were changed to joint tenancy with Fox having a right of survivorship. Although Estes signed the card changing the ownership, Fox obtained the card, filled it out, and returned it to the bank.

¶ 8    On January 24, 1995, using her power of attorney, Fox had the locks on two safe deposit boxes drilled. The $120.00 cost to drill the locks was paid from Bank IV Account 3129. The boxes contained certificates of stock in Seneca Oil Company, First State Bancorp, Inc., Century Bancorporation and Admiral State Bank. Fox sent the certificates to Merrill Lynch, an investment company, to determine their value and for deposit into her account. Merrill Lynch informed Fox that the stocks in three of the companies were of no value. All of the certificates were returned to Fox. Merrill Lynch requested that Fox submit a "stop release letter" for a least one of the stocks before it could be transferred. The "stop release letter" was not returned to Merrill Lynch. During Fox's first deposition, she made no mention of the stocks when asked about the gifts Estes had made during his lifetime even though she retained the stocks in her possession and, in the probate proceedings, claimed they were a gift to her.

¶ 9    In addition to the stock certificates, the safe deposit boxes contained abstracts to real property owned by Estes and some silver flatware. The flatware was delivered to Mrs. Kramer and one of Estes' cousins. Fox admits using her power of attorney on February 5, 1995, to deed the real property which was the subject of the abstracts to herself.

¶ 10    On January 24, 1995, using her power of attorney, Fox changed the title on Estes' 1990 Lincoln Continental from sole title in Estes to joint tenancy with herself. On the same day, Fox instructed Merrill Lynch to transfer $32,745.00 from CMA Account Number 595–78526 (CMA Account), an account in which Fox had no interest, to Bank IV Account 1967, an account in which Fox was joint tenant.

¶ 11    On February 1, Fox paid herself $2,376.00 for around-the-clock care of Estes

and for reimbursement of expenses. The check was written on Bank IV Account 1967. On February 5, Fox paid herself $8,184.00 for Estes' nursing care. During the time that Fox paid herself for nursing care, Estes had nurses and sitters to help him during some hours of the day. Even though Fox paid herself for Estes' care, she did not file an income tax return reporting the payments claiming they were gifts. Also on February 5, Fox wrote twelve checks totaling $105,-000.00 to her heirs on Bank IV Account 1967. Bank IV Account 1967, on which Fox wrote the checks, did not have sufficient funds on February 5 to pay all of the checks that Fox had written to herself and her heirs.

¶ 12 On January 30, 1995, Fox called Merrill Lynch and had it liquidate the assets in the CMA Account, including liquidating bonds which had not matured. The net sales proceeds from the liquidation totaled $68,-555.00. The expert witness calculated the loss to the estate from the premature sale of the assets in the CMA account to be $26,-326.00. Then on February 9, the day after Estes' death and at Fox's instruction, $69,-904.00 was transferred from the CMA Account to the joint tenancy Bank IV Account 1967 apparently to cover the checks that Fox had written to her heirs and herself.

¶ 13 On February 1, 1995, Fox admits personally completing a change of beneficiary form for Estes' IRA account (IRA account) with Merrill Lynch. The change of beneficiary form named Fox as primary beneficiary and her three children as contingent beneficiaries. The change was entered into the Merrill Lynch's records on February 9, 1995. The balance in the account on the day of Estes' death was $70,814.00. The change of beneficiary form was signed by Estes and acknowledged by an employee of Merrill Lynch. The employee admits that she did not see or talk to Estes before acknowledging his signature.

¶ 14 Upon Estes' death, Fox was named personal representative in the probate proceedings (probate). On April 24, after being named personal representative, Fox traded the 1990 Lincoln, valued at $6,000, for a 1994 Lincoln. She paid the balance of the cost of the 1994 Lincoln with checks on the Bank IV accounts previously owned by Estes and which Kramer alleges should have been probate assets. Fox also made the following expenditures from the Bank IV accounts: $138.00 for the transfer of title for the 1990 Lincoln, $550.00 for payment to the Smiths,[1] and her personal credit card payments of $882.00. Estes also had a checking account at Bank of Oklahoma Freeway for which Fox did not account in the estate inventory.

¶ 15 The day after Kramer filed a motion in the probate on July 24, 1995, to have certain items returned to the estate, Fox executed a quit claim deed to the real estate returning it to Estes' estate. Then by payments on August 8, 1995, and August 16, 1995, Fox returned to the estate the amount of the transfers she had made to her heirs.

¶ 16 In the motion filed July 24, 1995, in addition to requests for the return of the assets to the estate, Kramer asked that Fox be removed as personal representative of the estate. On the same day, Kramer filed a non-probate civil action in the district court (civil case).[2]

¶ 17 Upon motion by Kramer and with the consent of Fox, the district court issued an order purporting to consolidate the two cases with the probate surviving, and for one hearing on all the issues. Kramer filed an

---

1. The record does not identify the Smiths. However, Fox does not assert that this is not her personnel expense. Kramer's expert witness lists this as a personnel expense of Fox, not as an estate expense.

2. The petition filed in the civil case seeks relief for the benefit of the estate and not a monetary damage award in tort. In his motion for an award of attorney fees from the estate, Kramer recognizes that the suit was brought for the benefit of the estate and not for recovery in tort in his own behalf. Kramer's attorney testified that the civil case was brought to bring the property into the estate.

The substance of the documents filed in the district court clearly shows that the suit is one for recovery of the property to the estate. The substance of the documents, not the form, controls. *Markwell v. Whinery's Real Estate*, 1994 OK 24, ¶ 6, 869 P.2d 840, 842. Because the suit was not one in tort, we need not address the issue of whether Oklahoma recognizes a tort for wrongful interference of an inheritance as urged by Kramer.

amended petition in the probate proceedings, asking for Fox be removed as personal representative and for a declaratory judgment "determining and settling all controversies now known and hereafter discovered between Robert L. Kramer and Opal Fox." Kramer also sought restitution from Fox for the following items:

| | |
|---|---|
| Assets used to purchase the 1994 Lincoln | $11,450.00 |
| Losses from sale of assets in Merrill Lynch CMA account | 16,232.00 |
| Amounts withdrawn from Merrill Lynch IRA account | 13,500.00 |
| Payments to Fox by Fox for Estes' care | 10,560.00 |
| Lost earnings on the payments to Fox's heirs | 1,160.00 |
| Lost earnings on withdrawals from Merrill Lynch IRA account | 535.00 |
| Assets from Bank of Oklahoma Freeway Account | 4,093.00 |
| Repayment of withdrawals for personal expenditures | 1,696.00 |
| Payments made by Kramer for accounting and legal fees (amount unknown at time of trial) | |
| 100 shares of Admiral State Bank Stock | |
| Penalties for inaccurate filing of Oklahoma Estate Tax Return (amount unknown at time of trial) | |
| Total of known requested reimbursements at time of trial | $124,779.00 |

## III. DECISIONS OF DISTRICT COURT

¶ 18 After a non-jury trial, the judge entered an order in probate with detailed finding of fact and conclusions of law. The order states, among other things: (1) Fox, in violation of her fiduciary duties as attorney in fact and personal representative, had transferred between $200,000 and $300,000 to herself and her heirs from Estes' assets, (2) Fox was not a credible witness and had destroyed all of her bank records, and (3) the testimony of Kramer's expert witness, Frances Potter, detailing Fox's improper actions and setting out the assets of the estate was not rebutted. The order (1) removed Fox as personal representative and named Kramer as personal representative of the estate; (2) approved a fee of $11,338.00 for Frances Potter, expert witness for Kramer, to be surcharged to Fox's inheritance; (3) approved a fee of $29,172.70 for James R. Eagleton, attorney for Kramer, to be surcharged to Fox's inheritance; (4) found Fox had paid Mr. McDougal, one of her lawyers, $5,184.00 from estate funds without the permission of the Court, found Mr. McDougal had earned an additional $4,176.00, found Mr. McDougal's work was occasioned by Fox's improper acts as attorney in fact, approved a fee of $9,360.00 for Mr. McDougal, and ordered the fee be charged solely to Fox's inheritance; (5) approved a fee for attorney, George W. Underwood, of $26,350.95, found the majority of Mr. Underwood's services were occasioned by Fox's improper acts, ordered court costs and expenses of $338.45 and $4,398.00 of his fee be paid from the residue of the estate, and ordered the remaining $23,003.00 be surcharged to Fox's inheritance; and (6) found Kramer had pled and proved a cause of action for Fox's tortious interference with his right to inherit and ordered Fox's inheritance to be surcharged one-third of $150,655.00 plus interest.

¶ 19 The district court entered a monetary judgment against Fox in the civil case for one-third of $150,65.00 plus interest and court costs. Both parties appealed. The Court of Civil Appeals affirmed the removal of Fox as personal representative, affirmed the appointment of Kramer as personal representative, and found the judgment of the district court, sitting in probate, in all other respects exceeded its authority. The Court of Civil Appeals did not address the judgment rendered in the civil case.

¶ 20 This Court granted Kramer's petition for certiorari. On certiorari, Kramer argues that the district court, sitting in probate, had authority to consolidate the two cases and decide all of the issue in probate proceeding.

## IV. ORDER CONSOLIDATING THE PROCEEDINGS

¶ 21 Section 1, title 58 of the Oklahoma Statutes defines the authority of the

district court sitting in probate. Under the version of section 1 applicable to these proceedings,[3] the district court sitting in probate has the power "to order and regulate all distribution of property or estates of deceased persons", Okla. Stat. tit. 58, § 1(A)(7) (1991), and the power "to make such orders as may be necessary to the exercise of the powers conferred by this chapter or by other law." *Id.* at § 1(A)(10). In order for the district court sitting in probate to order the distribution of the decedent's property, it is necessary to determine the property to be distributed. Therefore, a district court, sitting in probate, has the power to determine what property is part of the decedent's estate. *See id.*

¶ 22 In the present case, interdocket boundaries limited probate to "(1) ascertaining whether the decedent died testate or intestate, and if testate, (2) what testamentary disposition, if any, may be admitted to probate, (3) the administration of the estate's assets and (4) the final account and distribution." Okla. Stat. tit. 58, § 1 (1991); *Wilson v. Kane,* 1993 OK 65, ¶ 6, 852 P.2d 717, 720; *Williams v. Mulvihill,* 1993 OK 5, ¶ 8, 846 P.2d 1097, 1102. Where the face of assets show no interest by the estate, probate is not the proper forum in which to settle a title dispute. *In re Estate of Kizziar,* 1976 OK 114, ¶ 5, 554 P.2d at 793. Probate's authority to determine title to property does not extend to disputes over property held adversely to the estate. *Id.* Fox was not claiming title to the property as an heir, but as a surviving joint tenant, donee, and named beneficiary of the property. Kramer's attempt to recover property held in Fox's name, not the estate's, does not fall within the limited parameters of probate's domain.

¶ 23 The replacement of the personal representative and the distribution of estate assets, including attorney fees and expert witness fees incurred on behalf of the estate, were exclusively within the probate domain, Okla. Stat. tit. 58, § 1(A) (1991), and, thus, were not proper for adjudication in the civil case. Because neither the court in the probate proceedings or the court in the civil case had authority to resolve all issues tendered, consolidation of the two cases was improper.

¶ 24 "The meaning and effect of an instrument ... depends on its contents and substance rather than on form or title given it by the author." *Horizons, Inc. v. Keo Leasing Co.,* 1984 OK 24, ¶ 4, 681 P.2d 757, 759. Although captioned as a motion to consolidate, the review of the record on appeal discloses that the order did not substantively consolidate the cases. The trial judge, who was assigned to both the probate and the civil case and the parties did not treat the cases as consolidated. All documents addressing issues in the civil case show both cases numbers, and the district court filed a judgment in the civil case. If the cases had been truly consolidated, the civil case, as a separate case, would have been extinguished. Consolidation is a misnomer as applied in the motion and the district court's order.

## V. AUTHORITY TO HOLD ONE HEARING

¶ 25 We first note that the parties agreed that the district court could address all issues in a single hearing. Because authority of the district court to hear all issues in a single hearing is not jurisdictional but based on interdocketary considerations, *In re Estate of Steen,* 1995 OK 86, 909 P.2d 62, the parties'

---

3. Section 1 of title 58 of the Oklahoma Statutes was amended in 1997. Section 1 as amended in 1997 provides:

> The district court which has jurisdiction and venue of the administration of any estate is granted unlimited concurrent jurisdiction and venue to hear and determine:
> 1. In whom the title to property is vested, whether the property is real personal, tangible, intangible, or any combination thereof;
> 2. Rights with respect to such property as to all persons and entities; and

> 3. Whether or not such property is subject to the jurisdiction of the court in the decedent's estate.

Okla. Stat. tit. 58, § 1(C) (Supp.1997). This amendment became effective November 1, 1997, and is thus not applicable in the present case. Section 1 when discussed in this opinion will refer to the pre-amended version which does not contain the above language.

agreement constituted a valid waiver of a right to separate hearings.

¶ 26 Further, it is a long time rule that a transcript in one case can be submitted as evidence in a subsequent case. *See St. Louis & S.F.R. Co. v. Walker*, 1916 OK ——, 61 Okla. 37, 160 P. 79. Here the parties implicitly agreed that the issues in both the probate and civil case could be heard at the same time. There is no tangible difference in a judge hearing the issues in one hearing and holding a hearing in one case and submitting a deposition as evidence in a different case. We see no legal reason to nullify the hearing when the parties could have submitted the transcript as evidence in either proceedings. It is a well established in Oklahoma that a trial judge can hear equitable and legal issues in the same proceeding. *I.C. Gas Amcana, Inc. v. Hood*, 1992 OK 119, ¶ 9, 855 P.2d 597 (1992). We find nothing in the Rules of Civil Procedure, Okla. Stat. tit. 12, §§ 551–668, 2101–3103 (1991), prohibiting a judge from acting in a dual capacity when presiding over a hearing when the parties agree, as they did here, and the issues and evidence are the same or similar.

¶ 27 This conclusion furthers the purposes of the Oklahoma Evidence Code, which states that it is to be construed to eliminate "unjustifiable expense and delay." Okla. Stat. tit. 12, § 2102 (1991). The transcript of the hearing will be considered as evidence for the purpose of examining the orders in both the probate and the civil case.

## VI. JUDGMENT IN CIVIL CASE

¶ 28 The judgment of the district court is not subject to reversal if the result is correct but based on faulty reasoning. *In re Estate of Bartlett*, 1984 OK 9, ¶ 4, 680 P.2d 369, 374. This Court is bound to "render, or cause to be rendered, the judgment that the trial court should have rendered." *Id.* In proceedings of equitable cognizance, an appellate court will examine and weigh the evidence. Only if the findings and judgment of the district court are clearly against the weight of the evidence, will they be reversed. *Id.*

¶ 29 Fox argues that the judgment in the civil case is against the weight of the evidence because changes in the holding of Estes' property before his death were gifts to her and her heirs. The elements necessary to establish an inter vivos gift are: (1) a competent donor, (2) freedom of will on the part of the donor, (3) donative intent to make the gift, (4) a donee capable of accepting the gift, and (5) delivery by the donor and acceptance by the donee. Additionally, the gift must be gratuitous and irrevocable and go into immediate and absolute effect with the donor relinquishing all control. *Davis v. Nat'l Bank of Tulsa*, 1960 OK 151, ¶ 17, 353 P.2d 482; *In re Estate of Stinchcomb*, 1983 OK 120, ¶ 16, 674 P.2d 26, 30; *Foster v. Rose*, 1951 OK ——, 205 Okla. 397, 238 P.2d 332.

¶ 30 Delivery to one acting in the capacity of the alleged donor's agent is in effect no delivery at all and insufficient to effectuate delivery for purposes of an inter vivos gift. *Foster v. Rose*, 1951 OK ——, 205 Okla. 397, 238 P.2d 332. In determining the alleged donor's intent to make a gift, "the facts and circumstances surrounding the parties, their relationship, and the direct expressions of the decedent" will be considered. *Id.* To establish an inter vivos gift after the death of the alleged donor, the evidence must be clear, explicit, and convincing as to every element. *In re Estate of Stinchcomb*, 1983 OK 120, ¶ 16, 674 P.2d 26, 30.

¶ 31 Fox did not establish by clear, explicit, and convincing evidence all the elements necessary to establish inter vivos gifts. First, the only evidence of donative intent is Fox's self-serving statements that Estes wanted her and her heirs to have the property. Second, Estes did not relinquish complete control over the property during his lifetime. Estes' name remained on title to the property. Third, if delivery was made to Fox, it was made to her as Estes' agent, not to her as a donee. Fox has failed to establish by clear and convincing evidence that Estes made inter vivos gifts to her of the property sought to be reclaimed for the estate. Where probate is precluded from doing complete justice, courts of equity will interfere. *In re Estate of Kizziar*, 1976 OK 114, ¶ 5, 554 P.2d 791, 793. Because the trial

**446**

judge presiding over the civil case was sitting in equity, it was error to grant a money judgment in favor of Kramer. *Id.* Further, the district court exercising authority over the civil case was without authority to distribute estate property. *See* Okla. Stat. tit. 58, § 1 (1991). In rendering the decision the district court should have made, a constructive trust is imposed on the property which should have been part of Estes' estate but was improperly diverted from the estate by Fox. *Id.; In re Estate of Bartlett,* 1984 OK 9, ¶ 4, 680 P.2d 369, 374.[4] This property should be considered as part of Estes' estate for distribution in the probate proceedings.

## VII. ADMISSION OF DEPOSITION

¶ 32 Fox complains that the district court erred in admitting the deposition of George Underwood, who served as attorney on behalf of both the estate and Fox. Admission of depositions as evidence at trial are controlled by title 12, section 3232 of the Oklahoma Statutes. Section 3232 allows the admission of depositions for the purpose of impeachment. It is clear from the record that the purpose of presenting the deposition testimony of George Underwood was to impeach his testimony during the hearing.

¶ 33 Error in admitting evidence is not reversible unless a substantial right of a party is affected. Okla. Stat. tit. 12, § 2104 (1991). Fox has not alleged that the admission of the deposition impacted a substantial right or prejudiced her. Also the party objecting to the admission of evidence must state the reason unless the reason is apparent. The basis for Fox's objection to the admission of the deposition was that depositions could not be received as evidence when the witness was present. This is not a correct statement of the law. Section 3232 specifically states that a deposition may be used as evidence for the purpose of impeachment even though the witness is present and testifying. For these reasons, we find no revers-

ible error in the admission of the deposition of George Underwood.

## VIII. PREJUDICE AND BIAS OF THE JUDGE

¶ 34 Fox argues that the trial judge was prejudiced and biased. A complete review of the record on appeal supports the trial judge's conclusions that the flurry of activity to change Estes' holding from estate property at his death to non-probate property for the benefit of Fox and her heirs was supported by the evidence. After a complete review of the record, we do not find that the trial judge abused his discretion or that Fox has suffered any injustice from the rulings of the court.

## IX. JUDGMENT OF THE DISTRICT COURT, SITTING IN PROBATE

A. Attorney fees and expert witness fees incurred by Fox and the estate

¶ 35 In the probate order, the district court ordered that attorney fees incurred for services in defending Fox's actions as attorney in fact be surcharged to Fox's inheritance, which is tantamount to paying them from estate assets. *In re Estate of Bartlett,* 1984 OK 9, ¶ 33, 680 P.2d 369, 380, emphasized that only attorney fees incurred which are "necessary for the preservation and care of the estate and not for representation" in matters unrelated to the administration of the estate can be reimbursed from estate assets. Pursuant to this rule, the probate court was without authority to order that Fox's attorney fees incurred in defending her actions as attorney in fact be paid out of estate assets. This same rationale applies to expert witness fees and costs incurred by Fox in so far as the services were utilized for her benefit and incurred in defending her actions as attorney in fact. *See* Okla. Stat. tit. 58, § 1 (1991).

---

4. Because an equitable remedy will result in the return of the property to the estate, the property will pass under the terms of the will which divides the residue of the property equally between Kramer and Fox. Thus, we need not address the issue of whether the district court

should have awarded Kramer one-half, rather than one-third, of the $150,655.00. However, we note that there is no evidence in the record on appeal to support a judgment of one-third of $150,655.00, rather than one-half of the amount.

**B. Expert witness and attorney fees incurred by Kramer**

¶ 36   The probate court awarded Kramer attorney fees from the estate assets. Generally, a beneficiary cannot recover attorney fees from an estate. *In re Schwint's Estate*, 1938 OK ——, 183 Okla. 439, 83 P.2d 161, 163. This Court has allowed exceptions where, as here, the services rendered were for the benefit of the estate.[5] *Arthur v. Arthur*, 1959 OK 148, 354 P.2d 199, 206; *In re Schwint's Estate*, 1938 OK ——, 183 Okla. 439, 83 P.2d 161, 163. In the present case, the personal representative held property adversely to the estate. Therefore, the burden of seeking the return of the property fell on the beneficiaries.

¶ 37   The probate court also awarded Kramer expert witness fees from the estate to be surcharged against Fox's inheritance. The expert witness fees were rendered for the benefit of the estate and were a necessary expense for the recovery of estate property. Like the attorney fees, the expert witness fees were recoverable. *See Arthur*, 1959 OK 148, 354 P.2d at 206. Because the services of Kramer's attorney and the expert witness fees were for the benefit of the estate, they were a proper charge against the estate.

**C. Premature nature of the surcharges**

¶ 38   The district court, sitting in probate, has the discretion of surcharging Fox's inheritance for Kramer's attorney fees at the proper time. Okla. Stat. tit. 58, § 1 (1991). Likewise, an indebtedness that Fox may owe the estate, such as money improperly transferred to her before Estes' death, may be surcharged against her inheritance at the proper time. *Smith v. Citizens Nat'l Bank in Okmulgee*, 1957 OK 153, 313 P.2d 505. The order of the probate court is a charge against Fox's inheritance. It does not purport to determine the identity of the heirs or their share of the estate.

¶ 39   An order surcharging a beneficiary's inheritance is premature until a determination of the heirs and each's share of the estate. *Steger v. Gibson*, 1955 OK 188, 287 P.2d 687, 692. At the time of the probate order in the present appeal, a determination of the heirs and their share of the estate had not been entered. Therefore, the probate court's imposition of the surcharges against Fox's inheritance was premature.

**X.  CONCLUSION**

¶ 40   In conclusion, we find no error in the trial judge holding a single hearing on all of the issues. The district court sitting in the civil case had authority to determine title to property held adversely to the estate and was correct in entering judgment against Fox and for Kramer. In rendering the judgment that the district court should have rendered in the civil case, a constructive trust for the benefit of the estate is imposed on the property improperly diverted by Fox from the estate. The property will be considered as property of the estate in the probate proceeding.

¶ 41   The district court, sitting in probate, had authority, as Fox acknowledges, to replace her as personal representative. The district court sitting in the probate matter did not have authority to determine title to property held adversely to the estate or to award, from estate assets, attorney fees and expert witness fees for services rendered to Fox in her pursuit of her claims which were adverse to the estate. The probate court had authority to surcharge Fox's estate for her indebtedness to the estate as determined in the civil case, after a determination of the heirs and their share of the estate, and for Kramer's attorney fees and expert witness fees. However, a surcharge of an inheritance is premature until a determination of the heirs and their share of the estate has been made.

¶ 42   The opinion of the Court of Civil Appeals is vacated. In the civil case number CJ–95–3232, a constructive trust for the benefit of Estes' estate is imposed. The matter is remanded to the district court sitting in

---

5.  We note that if Kramer were awarded damages for a tort action, he could not recover attorney fees from either Fox or the estate based on the record on appeal. Okla. Stat. tit. 12, §§ 936–40 (1991).

the probate matter, case number P–95–266, for proceedings consistent with this opinion. CERTIORARI PREVIOUSLY GRANTED; COURT OF CIVIL APPEALS' OPINION VACATED; ORDER OF DISTRICT COURT IN CASE NUMBER P–95–266 REVERSED IN PART, AFFIRMED IN PART, AND REMANDED WITH INSTRUCTIONS; JUDGMENT OF DISTRICT COURT IN CASE NUMBER CJ–95–3232 REVERSED AND CONSTRUCTIVE TRUST IMPOSED.

¶ 43 HARGRAVE, V.C.J., LAVENDER, OPALA, ALMA WILSON, and KAUGER, JJ., concur.

¶ 44 SUMMERS, C.J., I would affirm the trial court, WATT, J., joins SUMMERS, C.J., concur in part; dissent in part.

¶ 45 SIMMS, J., dissents.

